## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

P.K., a minor, by her mother and natural )
guardian, JUDY HASSINGER and )
JUDY HASSINGER in her own right, )
                                        )
            Plaintiffs, )
                                        )
v.                                      )    C.A. No. 10-cv-783 (GMS)
                                        )
CAESAR RODNEY HIGH SCHOOL, THE )
CAESAR RODNEY SCHOOL DISTRICT, and )
THE BOARD OF EDUCATION OF THE )
CAESAR RODENY SCHOOL DISTRICT, )
                                        )
            Defendants. )

## MEMORANDUM

## I.    INTRODUCTION

On September 15, 2010, the plaintiffs, P.K.[1], a minor, and her mother Judy Hassinger

("Hassinger") (collectively, "the plaintiffs"), filed the above-captioned action against Caesar

Rodney High School ("the High School"), the Caesar Rodney School District ("the District"),

the Board of Education of the Caesar Rodney School District ("the Board"), and Corporal

Andrew Palese ("Palese"), the school resource officer at the High School[2] (collectively, "the

defendants"). (D.I. 1.)   In their Complaint, the plaintiffs seek compensatory and punitive

damages, as well as costs of suit, interest, and attorney fees in connection with the defendants'

alleged violations of Title IX, 20 U.S.C. § 1681 ("Title IX"), and Delaware state laws. (Id. at ¶

9.)   Specifically, the plaintiffs allege that the defendants: (1) violated Title IX by failing to

---

[1] P.K. is a minor and is identified by pseudonym for this reason. (D.I. 1.) G.R., P.K.'s former boyfriend and the individual who allegedly sexually harassed P.K., is also a minor and, therefore, is likewise referred to by pseudonym. (Id.) Hassinger brings suit on her own behalf as well as on the behalf of her daughter, P.K., based on her relationship as P.K.'s mother and natural guardian. (Id.)

[2] On October 19, 2011, Palese was dismissed from this suit with prejudice pursuant to a Stipulation of Dismissal the parties filed on that date. (D.I. 32.)

remedy and/or protect P.K. from student-on-student sexual harassment at the High School (id. at ¶¶ 48-60); (2) violated Delaware's school bullying statute, 14 Delaware Code § 4112D, by failing to adequately respond to or institute measures to prevent the bullying and harassment P.K. experienced (id. at ¶¶ 61-83); (3) violated 14 Delaware Code § 4112(b)(3), as it relates to teen dating violence, in that the defendants' employees did not report P.K.'s harassment to the High School principal at the outset (id. at ¶¶ 84-94); and (4) acted with gross or wanton negligence in violation of Delaware law (id. at ¶¶ 95-103).

On September 29, 2011, following completion of discovery, the defendants filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). (D.I. 24.) In response, the plaintiffs filed an Answering Brief opposing the motion on October 17, 2011 (D.I. 31) and, on October 27, 2011, the defendants filed their Reply (D.I. 33). Presently before the court is the defendants' Motion for Summary Judgment. (D.I. 24.) For the reasons stated below, the court will grant the motion.

## II. BACKGROUND

The following facts are taken from the plaintiffs' Complaint. (D.I. 1.) In August 2009, P.K. entered the High School as a ninth-grade student. (Id. at ¶ 13.) The High School is a public school located in the District in the State of Delaware. (Id. at ¶ 2.) The Board is responsible for overseeing the affairs of the District and of the High School. (Id. at ¶¶ 3-4.) As noted, the High School, District, and the Board are each named defendants in this action.

During the 2008-2009 school year, P.K. attended eighth-grade at Fred Fifer III Middle School, where she was a member of the National Junior Honor Society of Secondary Schools[3] and an "exemplary student." (Id. at ¶ 10.) In March 2009, P.K. began dating a fellow male

---

[3] Membership in the National Junior Honor Society of Secondary Schools is awarded based on "scholarship, leadership, service, character, and citizenship." (D.I. 1 at ¶ 10.)

student, G.R. (Id. at ¶ 11.) In the summer of 2009, Hassinger discovered that G.R. was "verbally and emotionally abusing" P.K. with "belittling and controlling behavior." (Id. at ¶ 12.) P.K. and G.R. began attending the High School in August 2009 and, shortly after the start of the school year, Hassinger recognized that P.K.'s grades "began to suffer." (Id. at ¶ 14.) Hassinger spoke with some of P.K.'s teachers[4] around this time to explain that "the decline in P.K.'s academic performance could be the result of the verbal and emotional abuse being inflicted on P.K. by G.R."[5] (Id.)

Over the winter academic break, Hassinger noticed a bruise on P.K.'s arm but, when she asked P.K. the cause of the injury, P.K. indicated that she "got [her] arm caught in the door." (Id. at ¶ 15.) On Friday, January 22, 2010, Hassinger learned that G.R. was physically abusing P.K. when P.K. disclosed that G.R. punched her in the back of the head that day. (Id. at ¶ 16.) P.K. also told Hassinger that she was no longer dating G.R.[6] (Id.) Hassinger then called the High School on Monday, January 25, 2010, "to warn them of the physical and emotional abuse and to inquire about what could be done to ensure P.K.'s safety while she was at school." (Id. at ¶ 17.) The High School referred Hassinger to its resource officer, Palese, a Delaware state trooper. (Id.) Palese spoke with P.K. that day, January 25, 2010, and P.K. told Palese that G.R.

---

[4] The plaintiffs' Complaint and Answering Brief do not identify which teachers Hassinger contacted at the beginning of the 2009-2010 school year. (D.I. 1; D.I. 31.) However, in what appears to be a typed exhibit that Hassinger brought to her deposition detailing the sequence of events, Hassinger wrote in handwritten print: "October 2010—called the school concerning about [P.K.] grades. Spoke with Biology—Drew Hughes [and] History—Hully Briel." (D.I. 25, Exh. 1 at A53.)

[5] Though not included in the plaintiffs' Complaint, deposition testimony indicates that Hassinger also called a High School guidance counselor around the same time to make the counselor aware of P.K.'s declining grades and the reason for it. (August 29, 2011 Deposition of Judy Hassinger (hereinafter, "Hassinger Deposition") 4:1-15.) The counselor, per Hassinger's deposition recollection, referred her to Palese. (Id.) In addition, P.K. stated in her deposition that one of P.K.'s teachers, Jennifer Scholl, became concerned that G.R. was "mistreating" P.K. and contacted the police about the students' relationship. (August 29, 2011 Deposition of P.K. (hereinafter, "P.K.'s Deposition") at 26:2-24; 27:1-24.) The Complaint indicates that Scholl contacted Palese when she learned that P.K. was in an abusive relationship. (D.I. 1 at ¶¶ 25-26.) P.K. also notes, however, that although Scholl had concerns about her relationship with G.R., P.K. did not disclose to Scholl that G.R. was physically abusing her. (Id. at 27:9-19.)

[6] During her deposition, P.K. acknowledged that she continued to date G.R. "until late February 2010," although she told Hassinger that she ended the relationship in January 2010. (P.K. Deposition, at 11:6-18.)

had verbally and physically abused her for several months. (Id. at ¶ 18.) Palese also spoke with G.R. and told both G.R. and P.K. that they should no longer share a locker. (Id. at ¶ 19.) Palese also reassigned P.K. to a new locker to limit interaction between the two. (Id.)

In February 2010, G.R. and his father sent numerous harassing text messages to P.K. and G.R.'s father called P.K. and left her a "frightening message." (Id. at ¶ 20.) G.R. and his father were subsequently arrested by the Dover Police and charged with criminal harassment.[7] (Id. at ¶ 21.) In April 2010, P.K. and her family attended a little league game at which G.R. and his friends were also in attendance. (Id. at ¶ 32.) At the game, G.R. "continually stared at [P.K.] and screamed, 'Fuck you' to P.K. and her family." (Id.)

Also that month, on April 29, 2010, G.R., in the first incident to occur on school grounds, pushed P.K. against a locker and slapped her.[8] (Id. at. ¶ 27.) P.K. told a teacher about the incident and the teacher informed Assistant Principal Fisher ("Fisher"). (Id. at ¶¶ 28-29; D.I. 25 at 3 (citing D.I. 25, Ex. 1).) Fisher brought P.K. to Palese to file a police report and called Hassinger to inform her of the situation.[9] (D.I. 1 at ¶¶ 27-28.) G.R. was then arrested,

---

[7] During her deposition testimony, P.K. stated that she told Palese of the harassing text messages before either she or Hassinger contacted the police. *See* P.K. Deposition at 21:2-24; 22:1-9. Palese told P.K. that she should contact the Dover Police Department because the harassing text messages were not sent at school or during school hours and, as a result, the High School was unable to take action. (Id. at 21:10-16.) P.K. and her mother ultimately contacted the police approximately one week later, though P.K. told Hassinger that she did not want to pursue the charges because she was afraid of getting "G.R. in trouble." (Id. at 22:3-9.)

[8] In various submissions, the parties describe this event as G.R. slapping P.K. after "slamming" her into a locker or, alternatively, as slapping her after dragging her into an empty stairwell. As P.K. made clear during her deposition, however, both versions describe the same slapping incident. (Id. at 19:15-24.) The court does not draw a conclusion as to where the event occurred.

[9] The plaintiffs allege, though it is uncorroborated by the present record, that Palese asked P.K. "in an accusatory manner why she had gone to one of her teachers about the abuse." (D.I. 1 at ¶ 29.) Specifically, the plaintiffs state:

Cpl. Palese then told P.K. "Don't go to any of your teachers, you go to me." Appearing to be more upset about his authority being questioned than he was about the abuse P.K. was experiencing, Cpl. Palese said that Ms. Scholl came to me and "blasted me" about this, and then added that "she didn't need to come down here and get into my business." Cpl. Palese told P.K. and her mother that he did not want to arrest G.R. again because he was concerned that another arrest would have a negative impact on G.R.'s future. He said that he would instead give G.R. a strong warning to stay away from P.K. and to have no contact with her. This reaction on the part

4

suspended from school for three days, and removed from the High School's baseball team. (Id. at ¶¶ 28-29.) Hassinger, however, believed that the High School's actions did not deter G.R., because G.R. continued to text message P.K. outside of school. (Id.)

On May 19, 2010, G.R. pled guilty to harassment charges and, immediately thereafter, P.K. "became the target of a campaign of retaliation in the form of verbal harassment and bullying by G.R.'s friends." (Id. at ¶ 33.) Specifically, on May 20, 2010,[10] whenever G.R.'s friends would pass P.K. in the hallway they would call her names like "whore" or "slut." (Id.) The Complaint does not allege that Hassinger or P.K. reported this harassment to Palese or any other High School employee.[11] On May 21, 2010, in the second reported incident to occur at the High School, G.R. attempted to push P.K. down a flight of steps. (Id. at ¶ 34.) Hassinger and P.K. met with a counselor in the High School's wellness center about the incident on May 26, 2010 and P.K., distraught from this and other incidents, indicated that she did not want to return to the High School. (Id. at ¶ 35.) The counselor stated that, in her opinion, P.K. should be excused from attending the last few weeks of school, but noted that Fisher would have to clear such a decision. (Id.) Hassinger and P.K. then met with Fisher the same day and Fisher agreed to excuse P.K. from attending school on Wednesday, May 26 through Friday, May 28, 2010. (Id. at ¶ 36.) Fisher stated that in order to allow P.K. to miss the remainder of the school year, he would have to receive approval from High School Principal Elwina Knight ("Knight"). (Id.)

---

of Cpl. Palese demonstrated that he was making light of the abuse and that he seemed more interested in protecting G.R. than he was of protecting P.K., the victim of the abuse.
As noted, Palese is no longer a party to this action as he was dismissed by party stipulation in October 2011. (D.I. 32.)

[10] Though the Complaint does not reference a specific date or specific dates on which G.R.'s friends harassed P.K., Hassinger noted in the typed event timeline she discussed at her deposition that this occurred on May 20, 2010. (D.I. 25, Exh. 1 at A54.)

[11] Although the Complaint does not allege, as is alleged with other incidents, that Hassinger and/or P.K. informed employees or administrators at the High School of G.R.'s friends' comments, P.K. did state in her deposition testimony that she informed Fisher of these harassing comments. (P.K. Deposition, at 44:1-5.) Specifically, P.K. stated that she made Fisher aware of these comments either on June 1, 2010 or at some point in early June 2010. (Id.)

On Tuesday, June 1, 2010,[12] Fisher informed Hassinger that Knight decided P.K. should finish the remainder of the school year at the High School. (Id. at ¶ 38.) According to Hassinger, Fisher indicated that P.K. could continue to leave her classes five minutes early in order to avoid contact with G.R. (Id.) The Complaint also alleges that, when P.K. "expressed how afraid she was at the thought of walking through empty hallways by herself," Fisher "told P.K. that she was strong enough to handle and overcome this." (Id.) Fisher also told Hassinger that she could discuss the matter further with Knight. (Id.) Hassinger then spoke with Knight over the telephone that day and, per the Complaint, Knight initially responded to Hassinger's request by stating that she "did not have time to fix every problem that comes up between boyfriends and girlfriends." (Id. at ¶ 40.) After hearing the details of G.R.'s harassment of P.K., however, Knight allegedly indicated that she "knew nothing about the abuse," "did not know that G.R., one of her students, had been arrested in School," and "'didn't know the seriousness of the situation.'" (Id. at ¶ 41.) Knight stated that she would call Hassinger back before the end of the day of June 1, 2010. (Id.) Knight did call Hassinger later that day and informed her that P.K. could complete the remainder of the school year from home.[13] (Id. at ¶ 42.) P.K. did not lose any credits for completing the year from home and was not academically or otherwise penalized in any way. (Id.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[12] Because Monday, May 31, 2010 was Memorial Day, Tuesday, June 1, 2010 was the first day P.K. would have returned to school after her permitted absence.

[13] Specifically, Knight permitted P.K. to miss the final twenty-one days of the 2009-2010 school year and did not require her to take final exams. (D.I. 1 at ¶ 42.)

6

of law." FED. R. CIV. P. 56(c). A "material fact" is one that "could affect the outcome" of the proceeding. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 568 n.10 (1986). The district court, when determining whether a genuine issue of material fact exists, must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *See Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Matsushita Elec. Indus.*, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e)).

Importantly, the mere existence of some evidence in support of the nonmoving party will not prove sufficient for denial of a summary judgment motion. *See Anderson*, 477 U.S. at 249. Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* Specifically, the party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Thus, a nonmoving party asserting that a material fact is in dispute must support this assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute. . . ." *See* FED. R. CIV. P. 56(c)(1). If the nonmoving party fails to make a

7

sufficient showing on an essential element of its case for which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## IV.    DISCUSSION

As noted, the plaintiffs contend that the defendants violated Title IX and Delaware laws by failing to remedy and/or protect P.K. from student-on-student harassment. In response, the defendants assert in their Motion for Summary Judgment, that the plaintiffs' suit should be dismissed pursuant to Federal Rule of Civil Procedure 56(c) because: (1) the plaintiffs have failed to establish a Title IX action as they have not shown that the defendants were "deliberately indifferent" to the harassment and/or acted "in a clearly unreasonable manner" (D.I. 25 at 7-13); (2) plaintiff Hassinger must be dismissed from the action in her own right as she has not suffered a cognizable injury[14] (id. at 7); and (3) once the plaintiffs' Title IX claim is dismissed, the court should refrain from exercising supplemental jurisdiction and should dismiss the state law claims (id. at 14-17). The court will examine the defendants' Motion for Summary Judgment below.

### A.    The Plaintiffs' Title IX Claim

The defendants first contend that the court should grant their Motion for Summary Judgment with respect to the plaintiffs' Title IX claim because the plaintiffs have failed to establish the elements required for this cause of action. (Id. at 7-13.) Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  The Supreme Court has established a private right of action for student-on-student sexual harassment against schools under Title IX. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999). The

---

[14] Because the court concludes that the plaintiffs have failed to establish a Title IX claim and that it will not exercise supplemental jurisdiction over the plaintiffs' state law claims, it is unnecessary for the court to address the defendants' second argument as to whether Hassinger can bring a claim in her own right.

private right of action only lies, however, where the school is deliberately indifferent to known acts of sexual harassment "that [are] so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." *Id.* at 650. The district's action or inaction "must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (citation omitted).

Deliberate indifference to acts of peer sexual harassment arises where the district's response or lack of response to the harassment is clearly unreasonable in light of known circumstances. *Id.* at 648. A Title IX plaintiff can establish liability by "showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 246 (2009) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). To establish deliberate indifference, a plaintiff must show that the school "made an official decision not to remedy" the sexual harassment. *See Gebser*, 524 U.S. at 290. This showing, which is a burden placed on the plaintiff, is purposely high "to eliminate any 'risk that [a recipient of federal funds] would be liable in damages not for its own official decision but instead for its employees' independent actions." *Davis*, 526 U.S. at 643.

To this end, a district is not liable for acts of harassment about which it has no knowledge or for harassment that occurs off school grounds. *Id.* at 644 (concluding that a school district "cannot be directly liable for its indifference where it lacks the authority to take remedial action"). Moreover, where a district is aware of harassment, it is not required to "remedy peer harassment" or to "ensure that . . . students conform their conduct to' certain rules." *Id.* at 648-49 (citation omitted). Rather, a district "must merely respond to known peer harassment in a manner that is not clearly unreasonable" in light of the known circumstances. *Id.* at 648. This

9

standard is "not a mere 'reasonableness' standard," however, such that "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

## 1. Whether Genuine Issues of Material Fact Exist at This Stage

Here, the plaintiffs' Complaint and the parties' submissions in connection with the instant motion depict a notably similar version of the events at issue. In fact, the plaintiffs note in their Answering Brief that "[t]he facts stated by the defendants are not disputed," though they condition this statement on the assertion that the defendants' recitation of the facts "do[es] not tell the entire story." (D.I. 31 at 2.) Despite the latter assertion, however, several facts detailing the defendants' actions are not in dispute and are directly relevant to the resolution of this motion. Specifically, and as pled in the plaintiffs' Complaint, Hassinger first contacted some of P.K.'s teachers and a guidance counselor at the High School at the beginning of the 2009-2010 school year to let them know that P.K.'s grades were likely declining due to the "verbal and emotional abuse" she was suffering as a result of her relationship with G.R. (D.I. 1 at ¶ 14.) At that point, no specific incidents of harassment or abuse were known to have occurred on or off school grounds and Hassinger did not alert the defendants of any such incidents.

Hassinger next contacted the High School on January 25, 2010 after she learned that G.R., in an event that occurred off school grounds, punched P.K. in the back of the head. (Id. at ¶¶ 16-17.) The High School transferred Hassinger to its school resource officer, Palese, who spoke with P.K. that day. (Id. at ¶ 18.) P.K. disclosed to Palese that she had been suffering physical and emotional abuse in her relationship with G.R. and Palese responded by reassigning P.K.'s locker so she would not share a locker with G.R. and their interaction would be limited.

10

(Id. at ¶ 19.) The plaintiffs next contacted Palese in February 2010, when G.R. and his father sent P.K. harassing text messages. (Id. at ¶ 20.) Because these text messages were not sent at the High School or during school hours, Palese suggested that Hassinger contact the Dover Police Department. (D.I. 25 at 2-3.) Hassinger informed the Dover Police of the text messages and G.R. and his father were arrested for harassment. (D.I. 1 at ¶¶ 20-23.)

On April 29, 2010, in the first event to occur on school grounds, G.R. pushed P.K. against a locker and slapped her. (Id. at ¶ 28; D.I. 25 at 3.) Fisher, upon learning of the incident from the teacher that P.K. reported it to, said that G.R.'s conduct was "unacceptable" and directed P.K. to Palese to file a police report. (D.I. 1 at ¶¶ 27-29; D.I. 25 at 3.) In response to this incident, G.R. was arrested, suspended, and removed from the High School's baseball team. (Id. at 3; D.I. 1 at ¶ 28.) In addition, P.K. was allowed to leave her classes early and to be accompanied by her friends in the hallways to avoid contact with G.R. (D.I. 25 at 3.)

Finally, on May 21, 2010, in the last reported incident to occur at the school, G.R. attempted to push P.K. down a flight of stairs. (D.I. 1 at ¶ 34.) Hassinger and P.K. met with a counselor in the High School wellness center on May 26, 2010 as well as with Fisher to discuss the incident and P.K.'s desire to not return to school. (Id. at ¶¶ 34-36.) Fisher excused P.K. from in-school attendance on Wednesday, May 26 through Friday, May 28, 2010 and indicated that he would speak with Knight about allowing P.K. to miss the remainder of the school year. (Id. at ¶ 36.) While Knight's initial decision was that P.K. should complete the academic year at the High School, upon speaking with Hassinger on June 1, 2010 and considering the situation, Knight agreed that P.K. could finish the year from home without academic penalty. (Id. at ¶¶ 38-42.)

11

As noted, and as the defendants correctly assert, the parties do not dispute the facts outlined in this section. (D.I. 1; D.I. 25; D.I. 31.) The plaintiffs, however, contend that these facts do not "tell the entire story" and that there are additional disputed facts relevant to their Title IX action. (D.I. 31 at 2.) Specifically, the plaintiffs state in their Answering Brief that: (1) P.K.'s homeroom teacher knew "she was having problems with G.R." before P.K. reported that G.R. slapped her, "but did nothing about it because he was waiting for [P.K.] to say something" (id. at 2); (2) P.K. informed one of her teachers, Jennifer Scholl ("Scholl"), about "the harassment in school and the physical abuse outside of school" and Scholl indicated "she was aware of how G.R. had been treating her and had witnessed it" (id. at 3); (3) P.K. told Fisher that G.R. "was still not leaving her alone" after his suspension and that Fisher told P.K. that "she is a strong girl and could handle it" (id.); (4) after P.K. told Palese that G.R. tried to push her down the stairs, Palese said he would suspend G.R. but did not do so because "he did not want to get G.R. in any further trouble with the law" (id.); and (5) the defendants did not respond to G.R.'s friends calling P.K. a "whore" and a "slut" in school (id. at 1).

After reviewing these allegations, however, the court concludes that they do not raise a genuine issue of material fact with respect to the plaintiffs' Title IX action. Specifically, and with regard to the plaintiffs' first assertion that P.K.'s homeroom teacher knew she was having problems with G.R. before the first incident at the High School and did nothing, the plaintiffs did not include this allegation in their Complaint and, further, have offered no evidence in support of this fact.[15] Second, the plaintiffs' allegation that Scholl knew G.R. was physically and emotionally abusing P.K. similarly fails to establish a disputed fact relevant to this examination.

---

[15] P.K. stated in her deposition that she told her homeroom teacher that G.R. had "slammed [her] up against the wall and slapped [her]," and that the teacher stated that "he could tell by like the way [G.R.] treated [her] by [her] locker that something was going on," but that "he was waiting for [P.K.] to say something." (P.K. Deposition, at 15:16-24.) P.K. stated that her teacher brought her to Palese upon learning that G.R. slapped her. (Id.) Aside from P.K.'s deposition, the plaintiffs have not provided additional support for this allegation.

12

In particular, the plaintiffs' Complaint alleges that Scholl discovered G.R.'s abuse of P.K. prior to the April 2010 slapping incident and states that she informed Palese, who indicated that he was aware of the situation and was taking action. (D.I. 1 at ¶ 26.) In the sequence of events alleged, Scholl contacted Palese before the first incident occurred at the High School, and Palese had separated G.R. and P.K.'s lockers by that point in time to limit their interaction. (Id. at ¶ 19.) Additionally, the plaintiffs' Complaint does not allege that Scholl witnessed or knew of any actual incidents of physical or emotional harassment, other than to say that she "became aware of it," and the plaintiffs have not provided any evidence to support their allegation.[16] Third, and with respect to the third and fourth allegations, the plaintiffs do not cite evidentiary support for their assertions and, as discussed in the next section, the statements attributed to Fisher and Palese are, nevertheless, immaterial as they do not impact the Title IX analysis. *See Lamont*, 637 F.3d at 181 (defining a material fact as one that "could affect the outcome"). Finally, the plaintiffs' allegation that the defendants did not respond to G.R.'s friends' harassing comments is similarly unsupported as the plaintiffs' Complaint does not allege that P.K. or Hassinger reported these incidents to the defendants. (D.I. 1.) Further, even assuming these comments were

---

[16] In fact, in her deposition P.K. explained the extent of Scholl's knowledge:

> Q: What did you talk about with Ms. Scholl?
> A: She just could see that the way he treated me in the hallways, and she would always say that I don't think he is any good for you and stuff like that.
> Q: And that was around December, right?
> A: Yes.
> Q: Okay. And at that point he had not physically hurt you; isn't that right?
> A: He had hit me, like at home and stuff.
> Q: But never at school yet?
> A: No.
> Q: Did you tell her that he was hitting you?
> A: No.

(P.K. Deposition, at 26:21-24; 27:1-15.)

13

reported, the sequence of events, as P.K. detailed in her deposition, negates the relevancy of this fact in the Title IX analysis.[17] (D.I. 1; D.I. 25, Ex. 1 at A23-52.)

In view of the foregoing, the court concludes that the plaintiffs have failed to present evidence sufficient to show a genuine issue of material fact for trial. Consequently, the court agrees with the defendants that the facts relevant in deciding this matter are not in dispute. *See Anderson*, 477 U.S. at 249 (directing that the nonmoving party must present enough evidence to enable a jury to reasonably find for it on the issue in question).

## 2. Whether the Defendants are Entitled to Judgment as a Matter of Law

Having determined that there are no genuine issues of material fact relevant to the Title IX claim, the court next evaluates whether the defendants are entitled to judgment as a matter of law on this count. In consideration of the defendants' motion, the parties' submissions in connection with it, and the relevant law, the court concludes, for the reasons outlined below, that the defendants are entitled to this judgment.

As noted, a plaintiff alleging a Title IX student-on-student harassment claim is required to show that a district: (1) was "deliberately indifferent" to known acts of sexual harassment that were "so severe, pervasive, and objectively offensive" that they deprived the victim of "access to educational opportunities or benefits"[18]; or (2) acted in a manner that was "clearly unreasonable"

---

[17] *See supra* note 10. Even assuming that P.K.'s deposition recollection is accurate and she reported these comments to Fisher on June 1, 2010 or shortly thereafter, the court does not find that this fact alters the Title IX analysis in light of the undisputed sequence of events. *See infra* Section IV.A.2. Specifically, and as discussed more fully below, P.K. reported to Fisher and others that G.R. attempted to push her down the stairs on May 26, 2010. (D.I. 1 at ¶¶ 34-35.) Therefore, if P.K. reported the harassing comments to Fisher on June 1, 2010, the day P.K. was excused from attending school for the rest of the academic year, these comments would likely have been addressed in the context of discussing the other incidents P.K. and/or Hassinger reported. To this end, the court concludes that the plaintiffs have failed to show: (1) that this fact is disputed, as the defendants do not contend that P.K. did not report this incident or reported it on a date other than June 1, 2010; and (2) that this fact, whether disputed or undisputed, is material in assessing the plaintiffs' Title IX claim.

The court also notes that, as with the other allegations raised in the plaintiffs' Answering Brief, the plaintiffs have failed to offer or cite to any evidentiary support for their allegations. (D.I. 31.)

[18] *Davis*, 526 U.S. at 645, 648; *see also Fitzgerald*, 555 U.S. at 246.

14

in light of known circumstances. *See Davis*, 526 U.S. at 633, 648-50. Here, the plaintiffs have failed to establish either element for their Title IX claim.

### a. Title IX and "Deliberate Indifference"

First, and with respect to the "deliberate indifference" showing requirement, the facts make clear that the defendants responded to the two incidents that occurred on school grounds as well as to Hassinger's reports that G.R. punched P.K. in the back of the head and sent her harassing text messages off campus. Specifically, in response to the incidents that occurred at the High School, the defendants arrested and suspended G.R. for pushing P.K. into a locker and slapping her, allowed her to leave class early to avoid encountering G.R. in the hallways, and ultimately permitted her to complete the remainder of the school year from home after G.R. attempted to push her down a flight of stairs.[19] Moreover, in response to the incidents that occurred off school grounds, the defendants changed P.K.'s locker to limit her interaction with G.R. and suggested that Hassinger call the Dover Police after she reported that G.R. and his father sent P.K. harassing text messages.[20]

The defendants' actions in response to these incidents fail to amount to a showing that "an official decision" was made "not to remedy the violation." *See Gebser*, 524 U.S. at 290; *Doe v. Allegheny Sch. Dist.*, C.A. No. 2:08cv1383, 2011 WL 3667279, at *7-*9 (W.D. Pa. Aug. 22, 2011) (concluding that where a district learned of student-on-student harassment and took action to address it, the plaintiff failed to demonstrate deliberate indifference); *Vaird v. Sch. Dist. of Philadelphia*, No. CIV. A. 99-2727, 2000 WL 576441 (E.D. Pa May 12, 2000) (concluding that where a student was sexually harassed and punched and then kicked one month later, the district was not deliberately indifferent in suspending the harasser for two days). To the contrary, the

---

[19] *See supra* Section 4.A.1.
[20] *See* P.K. Deposition, at 21:1-24; 22:1-9.

undisputed facts here clearly illustrate that the defendants responded to each incident as it was reported and irrespective of whether it occurred on or off school grounds. Thus, deliberate indifference has not been shown. *See, e.g., Allegheny Sch. Dist.*, 2011 WL 3667279, at \*9 (concluding that summary judgment is appropriate where there is no evidence of "a decision not to remedy the sexual harassment"); *Vaird*, 2000 WL 576441, at \*2-\*3 (finding that where a district suspended a student for two days in response to harassment and worked to change the students' schedules to limit interaction, a "reasonable jury could not conclude that Defendants were deliberately indifferent").

In reaching this conclusion, the court notes that the plaintiffs' assertion that the defendants demonstrated deliberate indifference by failing to stop or protect P.K. from G.R.'s friends' harassing comments, does not change this analysis. First, and as explained above, the plaintiffs' Complaint does not allege that P.K. or Hassinger informed the defendants of these incidents. (D.I. 1.) Second, even assuming, consistent with P.K.'s deposition testimony, that she informed Fisher of these incidents on June 1, 2010 or soon thereafter, the court does not agree that the facts set forth can establish that the defendants were indifferent to these comments. (D.I. 31 at 2-3.) Rather, P.K.'s recollection that she told Fisher of the May 20, 2010 incident on or around June 1, 2010 means that her reporting of the harassing comments would have coincided with her report that G.R. attempted to push her down a flight of stairs on May 21, 2010. Consequently, because the defendants would have learned of both incidents at approximately the same time and responded by excusing P.K. from attending school for three days and, subsequently, for the remainder of the school year, the court finds that the plaintiffs have not shown that the defendants were deliberately indifferent to P.K.'s plight.

16

Likewise, the plaintiffs' allegations (1) that Fisher told P.K. she is a "strong girl and could handle and overcome this" (D.I. 31 at 3), (2) that Palese voiced irritation that P.K. would involve one of her teachers in the situation of responding to G.R.'s harassment (D.I. 1 at ¶¶ 29-30), and (3) that the District's superintendent did not return Hassinger's calls and instead instructed Knight to handle the situation (id. at ¶¶ 44-45), similarly fail to establish deliberate indifference. Specifically, and with regard to the first two assertions, the plaintiffs' claims that Fisher and Palese made comments demonstrating deliberate indifference is directly rebutted by the actions each took in response to G.R.'s harassment. In particular, even assuming that Fisher and Palese made the alleged statements,[21] the undisputed facts demonstrate that Fisher excused P.K. from school for three days when he learned of the May 21, 2010 incident, Fisher and Palese instigated the arrest and suspension of G.R. for slapping P.K., and Palese changed P.K.'s locker and allowed her to leave class five minutes early. Consequently, the court concludes that the plaintiffs' allegations as to Fisher and Palese's comments are insufficient in showing an "official decision" by a defendant "not to take action." Finally, the fact that the District's superintendent did not return Hassinger's calls and delegated the responsibility of handling the situation to Knight is immaterial because district administrators have the authority to delegate such tasks to school administrators or resource officers and Knight took action to handle the situation. *See, e.g., Rost v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1121 (10th Cir. 2008) (concluding that a district administrator may delegate responsibility for handling a situation of student-on-student sexual harassment to a district employee, such as a school resource officer, without violating Title IX).

---

[21] As noted, the plaintiffs have not provided evidence to support the factual assertions that the defendants made these statements, aside from their Complaint accusations and Hassinger and P.K.'s deposition testimonies. (D.I. 1 at ¶¶ 29-30, 28; D.I. 25, Exh. 1.)

17

In light of the foregoing, the court concludes that the plaintiffs have failed to show that the defendants were deliberately indifferent to the student-on-student sexual harassment alleged in this case.

### b. Title IX and "Clearly Unreasonable"

The plaintiffs also fail to demonstrate that the defendants' response to the student-on-student harassment was "clearly unreasonable." Instead, relevant case law instructs that the defendants' actions in response to G.R.'s conduct were not clearly unreasonable and the plaintiffs refrain from attempting to distinguish such precedent.[22] Specifically, and as has been established by district courts in this circuit and others, courts have found that summary judgment is appropriate where it is shown that the defendant(s) disciplined the harasser, steps were taken in an attempt to end the harassment, the harasser was suspended, and/or the defendants attempted to change the harasser or victim's schedule to limit their interaction. *See, e.g.*, *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist.*, 315 F.3d 817, 823-24 (7th Cir. 2003) (stating that a district's response is not "clearly unreasonable" and summary judgment is appropriate where a district disciplines the harasser and takes steps to attempt to end the harassment); *Ings-Ray v. School District of Philadelphia*, No. Civ. A. 02-cv-3615, 2003 WL 21250556 (E.D. Pa. Apr. 30, 2003) (concluding that summary judgment was appropriate where the defendants suspended the harasser and transferred the students out of a common class to minimize their contact); *Vaird*, 2000 WL 576441, at *2-*3 (noting that a district's decision to respond to harassment by

---

[22] In their Answering Brief, the plaintiffs cite to only two cases to support their Title IX claim and rebut the defendants' arguments. (D.I. 31 at 9.) Specifically, the plaintiffs, citing *Roe ex rel. Callahan v. Gustine Unified Sch.*, 678 F. Supp. 2d 1008 (E.D. Ca. 2009), contend that the court should not grant the defendants' instant motion because a "claim [should] go to the jury if the plaintiff advanced some evidence in support." *Gustine Unified Sch.*, 678 F. Supp. 2d at 1038 (denying summary judgment where the plaintiff set forth enough evidence that the court could conclude that a reasonable jury may find the defendants' response to the alleged harassment "clearly unreasonable"). The plaintiffs also cite to *Doe ex rel. Doe v. Coventry Bd. Of Educ.*, 630 F. Supp. 2d 226 (D. Ct. 2009), for the same contention, but do not distinguish any of the cases the defendants cite in their Opening Brief. (D.I. 31 at 8-12.)

18

suspending the harassing student and changing the student's class schedule was not "clearly unreasonable").

Here, the defendants employed nearly all of these methods—arresting and suspending G.R., talking to G.R. about his behavior through the issuing of a strong warning, and removing G.R. from the High School's baseball team as a result of his suspension. Additionally, the defendants changed P.K.'s locker, permitted her to leave class five minutes early to avoid G.R. in the hallways, and ultimately granting her permission to complete the school year from home without academic penalty. Although the defendants did not, as Hassinger requested, expel G.R. from the High School, such action was not necessary for the defendants' actions to meet the "not clearly unreasonable" standard required for Title IX compliance. *See Davis*, 526 U.S. at 648 (stating that "victims of peer harassment [do not] have a Title IX right to make particular remedial demands"); *Rost*, 511 F.3d at 1123 (concluding that "schools need not expel every student accused of sexual harassment to protect themselves from liability" (citing *Davis*, 526 U.S. at 648)).

Moreover, the plaintiffs' argument that G.R.'s continued harassment of P.K. demonstrates that the defendants' actions were unreasonable, is unfounded. It is well-established that schools are not required to "remedy" harassment or to conform their students' behavior to a certain manner of conduct. Instead, as the Supreme Court has made clear, the effectiveness of a district's methods is not a factor considered in the Title IX analysis and ineffectiveness is not dispositive of Title IX liability. *See Davis*, 526 U.S. at 648-49 (stating that districts are not required to "remedy" the harassment or "purg[e] their schools of actionable peer harassment" to avoid Title IX liability). In view of this precedent, the plaintiffs' assertions that (1) Palese "knew or should have known" that his efforts to deal with the harassment were "minor step[s]" that

19

"would be ineffective or unreasonable under the circumstances" (D.I. 1 at ¶ 19), (2) the High School's response of arresting and suspending G.R. after he pushed P.K. into a locker and slapped her "did not deter [him]" (id. at ¶ 28), and (3) G.R.'s friends' verbal harassment of P.K. and his attempt to push her down a flight of stairs shows that the defendants' measures proved ineffective (id. at ¶¶ 33-34), do not negate or undermine this court's finding that the plaintiffs have failed to show the defendants' actions were clearly unreasonable.

Consequently, because the court concludes that the plaintiffs have not, as required to establish a Title IX claim, shown that the defendants were "deliberately indifferent" to the student-on-student sexual harassment P.K. experienced or that their actions were "clearly unreasonable," the court will grant the defendants' Motion for Summary Judgment.[23]

## B.    Plaintiffs' Delaware State Law Claims

As noted above, the plaintiffs also assert state law claims with respect to Delaware's school bullying prevention and teen dating violence statutes, in addition to a gross or wanton negligence claim. (D.I. 1.) In determining whether to retain the plaintiffs' state law claims, the court considers the statutory circumstances set forth in 28 U.S.C. § 1367(c), under which a district court may decline to exercise supplemental jurisdiction. Specifically, district courts may decline to exercise such jurisdiction where: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003); *see also* 28 U.S.C. § 1367(c)(1)-(4). Here, because the court has granted the defendants' Motion

---

[23] The court notes that, while it is sympathetic to the harassment P.K. endured and concludes that the plaintiffs could establish, on these facts, that this harassment was in fact "severe, pervasive, and objectively offensive," nonetheless the plaintiffs' Title IX claim is unavailing for the reasons discussed.

20

for Summary Judgment and, in so doing, dismissed the Title IX claim over which it had original jurisdiction, the court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims.

## V. CONCLUSION

For the foregoing reasons, the court will grant the defendants' Motion for Summary Judgment and will decline to exercise supplemental jurisdiction over the plaintiffs' state law claims.

Dated: January 27, 2012

CHIEF, UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

P.K., a minor, by her mother and natural )
guardian, JUDY HASSINGER and )
JUDY HASSINGER in her own right, )
)
        Plaintiff, )
)
v. )     C.A. No. 10-cv-783 (GMS)
)
CAESAR RODNEY HIGH SCHOOL, THE )
CAESAR RODNEY SCHOOL DISTRICT, and )
THE BOARD OF EDUCATION OF THE )
CAESAR RODENY SCHOOL DISTRICT, )
)
        Defendants. )
_____)

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1. The defendants' Motion for Summary Judgment (D.I. 24) is GRANTED; and

2. The Clerk of Court is directed to close this case.

Dated: January **27** 2012

CHIEF UNITED STATES DISTRICT JUDGE